## KAILA MARSHALL *v.* HARTFORD HOSPITAL ET AL.
## (AC 20345)

Foti, Spear and Dupont, Js.

Argued May 1—officially released September 25, 2001

*William J. Sweeney, Jr.*, with whom, on the brief, was *Katarzyna Maluszewski*, for the appellant (plaintiff).

*Donna R. Zito,* with whom, on the brief, was *Stephen V. Manning,* for the appellees (defendants).

*Opinion*

DUPONT, J. The primary issues in this medical malpractice action brought by a mother on behalf of her minor child are whether there was a unity of interest between the two defendants, Victor C. Herson, a physician (defendant physician), and Hartford Hospital (defendant hospital), for purposes of determining the number of peremptory challenges in the selection of a jury, and whether the trial court properly directed a verdict for the defendant physician and refused to set aside a jury verdict for the defendant hospital. We affirm the judgment of the trial court.

The plaintiff, Kaila Marshall, was born prematurely at Hartford Hospital. Six days after birth, she developed complications from the insertion of an intravenous catheter that resulted in the loss of her fingers on one hand.[1] The plaintiff alleged that the defendant hospital and the defendant physician, who was the attending neonatologist in the defendant hospital's neonatal intensive care unit, were negligent in diagnosing and treating the complications. At the conclusion of the plaintiff's case, the court directed a verdict in favor of the defendant physician. At the conclusion of the entire case, the jury returned a verdict in favor of the defendant hospital,[2] which the court refused to set aside.

---

[1] Paragraph six of count one of the plaintiff's complaint alleged that during the course of a change in the IV feed in the plaintiff's right wrist "the IV insertion missed the proper vein . . . and obstructed the flow of blood to her right hand." In the allegations of negligence contained in paragraph eight of that count, there is no contention that the use of the IV feed was inappropriate. The insertion of the catheter was, however, described as "improper." Count one relates to the defendant hospital's negligence.

[2] The plaintiff originally named a third defendant, a nurse in the neonatal unit of the defendant hospital, but withdrew the action as to the nurse before trial. Thus, the original complaint consisted of three counts—count one against the defendant hospital, count two against the defendant physician and count three against the nurse.

In the first count against the defendant hospital, the plaintiff alleged that the negligence and carelessness of the defendant hospital through its agents, servants or employees, or all of them, who were acting within the scope of their agency, service or employment, caused her injuries, because, after discerning that the IV insertion had blocked the flow of blood to her hand, they failed to prevent necrosis[3] and committed acts that promoted it. That allegation fails to identify a specific employee, servant or agent. The complaint also alleged that specific employees, not including the defendant physician, were negligent and careless because they (1) applied warm soaks to the plaintiff's wrist and hand, which promoted necrosis, and (2) failed to call a physician immediately. The complaint further alleged that the defendant physician, as an agent, servant or employee, was negligent in that he neglected to attend to the plaintiff in a timely fashion, thereby losing or decreasing the chance for successful treatment. The other allegations as to the defendant hospital do not name specific employees, agents or servants, but allege failure to treat the plaintiff in a timely fashion, lack of a sufficiently trained or experienced staff to deal with the plaintiff's condition, and failure to train its staff properly for the diagnosis and treatment of arterial insufficiency.

The plaintiff's second count was against the defendant physician in his individual capacity and described him as an attending physician in the neonatal unit of the defendant hospital. The defendant physician allegedly did not exercise the degree of skill or care ordinarily exercised by physicians in that (1) he failed to attend to the plaintiff in a timely fashion, thereby losing or minimizing the chance for successful treatment, and (2) he neglected to obtain consultations from other

---

[3] Necrosis is the death of living tissue, especially when it is still in contact with the living parts around it.

physicians with more experience in dealing with the plaintiff's condition so as to lose or decrease the chance for successful treatment.

The plaintiff's complaint as outlined was the amended complaint dated June 16, 1999, and was in effect at the time the trial began. It is, therefore, the complaint governing our discussion of the directed verdict for the defendant physician and the court's refusal to set aside the verdict for the defendant hospital. A prior complaint, dated January 6, 1998, in effect at the time the court ruled on the number of peremptory challenges for the parties, governs that issue.

Certain facts are not disputed. The plaintiff weighed slightly more than one pound at birth and was experiencing poor blood flow to her right hand. The unit nurses used various treatments to alleviate the condition, but her condition did not improve. Some four hours after the condition was first noticed, the defendant physician arrived for his regular shift and ordered the application of nitroglycerin paste to the plaintiff's hand, which order was not carried out until three hours later. The defendant physician consulted other physicians later that same day as to other possibilities. No other treatment, however, was used, gangrene developed and the plaintiff's right-hand fingers autoamputated.

I

The court, *Wollenberg, J.*, presided over jury selection. That court ruled on June 8, 1999, that no unity of interest between the defendant physician and the defendant hospital existed and, consequently, allowed each defendant four peremptory challenges.[4]

---

[4] General Statutes § 51-241 provides: "On the trial of any civil action to a jury, each party may challenge peremptorily three jurors. Where the court determines a unity of interest exists, several plaintiffs or several defendants may be considered as a single party for the purpose of making challenges, or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly. For the purposes of this section, a

The court, *Graham*, *J.*, presiding, reviewed the record and consulted with counsel in connection with the plaintiff's motion for rectification and articulation regarding peremptory challenges. Judge Graham found that nine jurors were chosen after Judge Wollenberg's ruling, that the plaintiff had four peremptory challenges at the start of jury selection, that the defendants together had eight peremptory challenges, that the plaintiff had used all four of her challenges prior to the selection of the ninth juror, that two jurors were excused after the selection of the ninth juror prior to trial, that the court gave the plaintiff and the defendants each one extra challenge, that the plaintiff used that extra challenge prior to the selection of two additional jurors, and that in total, the defendants had nine challenges and the plaintiff five challenges.

Judge Graham reviewed Judge Wollenberg's ruling as to the number of peremptory challenges allowed the parties, and also concluded that the defendant physician and the defendant hospital did not have a unity of interest. Judge Graham noted that the allegations against the defendant hospital were based on claims of commission and omission by the nurses as well as the defendant physician. Count two contained allegations against the defendant physician and were based on his own claimed acts and omissions. The court further

'unity of interest' means that the interests of the several plaintiffs or of the several defendants are substantially similar."

The last two sentences of the statute were added by amendment in Public Acts 1993, No. 93-176, § 1.

General Statutes § 51-243 (a) provides in relevant part: "In any case when the court directs the selection of alternate jurors, each party may peremptorily challenge four jurors. Where the court determines a unity of interest exists, several plaintiffs or several defendants may be considered as a single party for the purpose of making challenges, or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly. For the purposes of this subsection, a 'unity of interest' means that the interests of the several plaintiffs or of the several defendants are substantially similar."

noted that the time frame for the nurses' alleged negligence preceded the defendant physician's alleged negligence,[5] and that the basis of the defendant hospital's liability differed from the basis of the defendant physician's liability and could differ as to the outcome of the liability question. Judge Graham, therefore, concluded that there was no unity of interest between the defendant physician and the defendant hospital, and that the ruling as to peremptory challenges was not a basis for setting aside the directed verdict in favor of the defendant physician or the jury verdict in favor of the defendant hospital. We agree with the trial court.

The plaintiff argues that the court improperly restricted her to four peremptory challenges while allowing the defendants eight challenges, which ruling affected the outcome of the trial. The plaintiff reasons that if the court had limited the defendants to four peremptory challenges, a wholly different jury panel would have been selected and that, because a party can never reconstruct the use of challenges, a new trial is needed. The plaintiff claims that a unity of interest exists because the defendant physician is an employee of the defendant hospital, thereby making the defendant hospital liable for his negligent acts, and because the defendant physician and the defendant hospital do not have an adverse relationship. The plaintiff admits that

[5] The complaint dated January 6, 1998, in effect at the time Judge Wollenberg ruled, contained allegations of negligence in count one as to the defendant hospital as follows: "The staff nurse or nurses who discovered or first treated the [plaintiff] after the discovery of the improper insertion failed or neglected to call immediately a physician, but rather waited approximately three to four hours to do so, or until approximately 10 a.m. on December 27, 1995," and "the attending physician . . . failed . . . to attend to the [plaintiff] until . . . approximately eight hours after being notified of the problem." It also contained an allegation in count two as to the defendant physician that "although he was called by the staff nurse(s) to attend to the [plaintiff] after discovery of the improper IV insertion, he failed or neglected to attend to the [plaintiff] until approximately 6 p.m. on December 27, 1995, or approximately eight hours after being notified of the problem."

the question involves the trial court's discretion. See *Walsh* v. *Stonington Water Pollution Control Authority*, 250 Conn. 443, 465, 736 A.2d 811 (1999); *Rivera* v. *St. Francis Hospital & Medical Center*, 55 Conn. App. 460, 463, 738 A.2d 1151 (1999).

If the plaintiff is correct, a new trial would be necessary; *Krause* v. *Almor Homes, Inc.*, 147 Conn. 333, 336, 160 A.2d 753 (1960); *Rivera* v. *St. Francis Hospital & Medical Center*, supra, 55 Conn. App. 464; and the issues raised in her other claims would not be reached.[6]

A review of Connecticut cases on the subject of peremptory challenges is instructive. Those cases arising before 1993, when the legislature amended the statute concerning peremptory challenges by adding and then defining the words "unity of interest"; see footnote 4; hold that the words "each party," as used in General Statutes (1930 Rev.) § 5577, the forerunner of General Statutes § 51-241, mean every plaintiff and every defendant is entitled to his, her or its own peremptory challenges. *Mourison* v. *Hansen*, 128 Conn. 62, 67, 20 A.2d 84 (1941); *Commercial Union Ins. Co.* v. *Frank Perrotti & Sons, Inc.*, 20 Conn. App. 253, 262, 566 A.2d 431 (1989). This is so despite the recognition in at least one Connecticut case that other states have interpreted statutes containing similar language to mean that all parties who are on one side of an action must share the statutory number of peremptory challenges unless their interests are diverse or antagonistic. *Mourison* v. *Hansen*, supra, 67.

---

[6] If a new trial is not necessary because the court's ruling as to the peremptory challenges issue was proper, but is necessary because both the directed verdict and the jury verdict are improper, the issue of peremptory challenges will likely recur, and so we discuss it. We recognize that if the plaintiff is correct as to only one of the latter two claims and a new trial is necessary as to only the defendant physician or only the defendant hospital, the issue of the number of peremptory challenges will be moot because the unity of interest issue will no longer exist.

Prior to 1993, a father who owned a car and a son who drove that car, in an action arising out of the negligence of the driver, were entitled to two sets of peremptory challenges because each was a party to the action, although their interests were not antagonistic. Id., 67–68. Other cases decided prior to 1993 are similar in result. Both of the plaintiffs, an insurance company seeking reimbursement for sums paid to its insured and the intervening insured party, are each entitled to the statutory number of challenges; *Commercial Union Ins. Co.* v. *Frank Perrotti & Sons, Inc.*, supra, 20 Conn. App. 262; as is true of a plaintiff employee and his employer who had made payments on the employee's behalf under the Workers' Compensation Act, General Statutes § 31-275 et seq.; *Reid* v. *New Haven*, 133 Conn. 446, 448–49, 52 A.2d 140 (1947); and true for a minor child and his mother who sought reimbursement for moneys paid for the medical and hospital expenses of her son. *Krause* v. *Almor Homes, Inc.*, supra, 147 Conn. 335–36.

In *Reid* and *Krause*, the rationale for allowing each plaintiff the statutory number of peremptory challenges was that each plaintiff had the right to bring a separate action. A similar result was reached in *Batick* v. *Seymour*, 186 Conn. 632, 443 A.2d 471 (1982), a pre-1993 case. In *Batick*, the plaintiff brought a two count complaint for personal injuries against a defendant husband and for the fraudulent conveyance by the defendant husband to his defendant wife. The court reasoned that because the same jury would be used for the trial of the two counts, it was proper to allow both defendants to have four peremptory challenges each during jury selection, even though the defendant wife's trial would not take place unless the defendant husband had been held liable on the first count. Id., 642.

Until 1993, Connecticut appellate courts liberally interpreted the statute governing peremptory chal-

lenges. In all of the civil cases of which we are aware, each party, whether plaintiff or defendant, regardless of whether the interests were substantially similar, was entitled to four peremptory challenges if alternate jurors were chosen.

The question now becomes whether the amendment to § 51-241 in Public Acts 1993, No. 93-176, § 1, restricted in any way the previous liberality espoused in the cited cases. If the multiple parties do not have a unity of interest because their interests are substantially dissimilar, the court must treat them individually for purposes of the number of peremptory challenges they receive. General Statutes § 51-241. To that extent, the amendment to the statute has changed nothing. If, however, there is a unity of interest, as found within the discretion of the trial court, the question is whether the court's discretion extends to allowing those with a unity of interest more than four challenges.

The legislative history supports a conclusion that the amendment was intended to cure unfairness in the composition of a jury that might occur where one party with only four challenges is the lone plaintiff or defendant and is faced with multiple adversarial parties with four challenges each.[7] See J. Steigelfest, "The Unity of Interest Rule and Peremptory Challenges in Connecticut," 69 Conn. B.J. 353 (1995). The legislative history contains statements that provide examples of unity of interest situations, such as principal and agent, automobile owner and operator, employer and employee acting

---

[7] Prior to the amendment of General Statutes § 51-241 in P.A. 93-176, there was an ease of interpretation and administration, and a recognition that when peremptory challenges are exercised as a group, there might be a difference of opinion among the group as to which potential jurors should be summarily excused. *Mourison* v. *Hansen*, supra, 128 Conn. 67. A rule allowing each party to have its own challenges regardless of unity of interest simplified jury selection, but also could lengthen it considerably when there are multiple plaintiffs and defendants.

within the scope of his or her employment or plaintiffs all injured in the same automobile accident. The remarks in the legislature indicate that in a medical malpractice action against a hospital and its physicians, unity of interest may be lacking despite the existence of an employee-employer relationship. 36 H.R. Proc., Pt. 16, 1993 Sess., pp. 5558–62. Thus, some of the pre-1993 cases that come within the examples as cited in the legislative history would now require a conclusion that there was a unity of interest. Although that is so, the question would then be whether, in spite of a conclusion that there is a unity of interest, the court could exercise its discretion and grant parties with that unity their own peremptory challenges.

A recent Supreme Court case addresses that question. See *Walsh* v. *Stonington Water Pollution Control Authority*, supra, 250 Conn. 443. In *Walsh*, the plaintiffs were two married couples who brought an action against the town of Stonington and its water pollution control authority. The plaintiffs were allowed sixteen peremptory challenges to the town's four challenges. *Walsh* analyzes § 51-241 and concludes that "[t]he decision of whether several plaintiffs or defendants will be considered a single party for the purpose of making challenges is, therefore, within the discretion of the trial court." Id., 465. *Walsh* states that if the court decides there is a unity of interest, the court may, in its discretion, determine whether that unity will trigger a limit on the number of peremptory challenges to be granted. Id., 465–66. In other words, even if there is unity of interest, which would allow a trial court to treat two or more defendants or plaintiffs as one for purposes of peremptory challenges, the court may nevertheless allow each defendant or plaintiff to have the statutory number of challenges.

*Beach* v. *Regional School District Number 13*, 42 Conn. App. 542, 682 A.2d 118, cert. denied, 239 Conn.

939, 684 A.2d 710 (1996); *Glass* v. *Peter Mitchell Construction Leasing & Development Corp.*, 50 Conn. App. 539, 718 A.2d 79, cert. granted, 247 Conn. 938, 723 A.2d 317 (1998) (appeal withdrawn July 6, 1999); and *Rivera* v. *St. Francis Hospital & Medical Center*, supra, 55 Conn. App. 464, all decided after the 1993 amendment, contain the same principles as those expounded in *Walsh*. In *Beach*, which *Walsh* cites approvingly, there was a one count complaint, identical allegations of negligence against all three defendants, one counsel for all three defendants, identical answers and special defenses, the same insurance carrier and the same indemnification agreement for all three defendants. On the basis of those facts, but recognizing that each defendant had a different duty, the court concluded that a jury could determine that each party was negligent but in a distinct manner and, therefore, there was no unity of interest. *Beach* v. *Regional School District Number 13*, supra, 551. In *Glass*, which *Walsh* also cites approvingly, this court determined that there was no unity of interest among five defendants because they were sufficiently antagonistic, a jury could find that each was negligent in a separate and distinct manner, and that the duties of each were different. *Glass* v. *Peter Mitchell Construction Leasing & Development Corp.*, supra, 546–47. *Rivera*, the last case in this trilogy, involved a plaintiff who brought an action against a hospital and two physicians. There was no unity of interest, although the physicians were employed by the hospital and they had the same attorney. The lack of unity of interest arose out of the facts that there was no surgical procedure in which both physicians were involved, the claims against the defendants were not identical, and it was possible for the plaintiff to prove one specification of negligence that proximately caused his injury as to one physician, but not the other or not the hospital. *Rivera* v. *St. Francis Hospital & Medical Center*, supra, 466.

On the basis of the cases cited, we conclude that § 51-241 allows the court to give each party, bound by a unity of interest with another party, individual peremptories or not, as the court, in its discretion, sees fit. The 1993 amendment establishes, consistent with case law then existing, that those who have no unity of interest must receive the allowable number of individual, statutory peremptory challenges. The amendment has only changed the law in that the court need not, in every case, give every party having a unity of interest a statutory number of challenges. We are aware of no Connecticut case, pre-1993 or post-1993, that has concluded that a court acted improperly by granting a party peremptory challenges; see *Walsh* v. *Stonington Water Pollution Control Authority*, supra, 250 Conn. 466; *Batick* v. *Seymour*, supra, 186 Conn. 642; *Reid* v. *New Haven*, supra, 133 Conn. 449; *Mourison* v. *Hansen*, supra, 128 Conn. 67; *Beach* v. *Regional School District Number 13*, supra, 42 Conn. App. 552; but are cognizant of cases that have concluded that the failure to give a party peremptory challenges was improper. *Krause* v. *Almor Homes, Inc.*, supra, 147 Conn. 336; *Rivera* v. *St. Francis Hospital & Medical Center*, supra, 55 Conn. App. 466; *Glass* v. *Peter Mitchell Construction Leasing & Development Center*, supra, 50 Conn. App. 547; *Commercial Union Ins. Co.* v. *Frank Perrotti & Sons, Inc.*, supra, 20 Conn. App. 263.

Our case law, therefore, remains liberal in its interpretation of General Statutes § 51-241 and General Statutes § 51-243 as to the granting of peremptory challenges. In doing so, the cases impliedly are mindful of the constitution of Connecticut, article first, § 19, as amended by article four of the amendments, which provides in relevant part: "In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law." Reversible error rarely occurs by

allowing a party more peremptory challenges than are provided by law. See *State* v. *Hancich*, 200 Conn. 615, 626, 513 A.2d 638 (1986).

The primary test to determine the existence of a unity of interest is whether there are separate issues of liability as to the two entities or persons. If the liability bases differ, there is no unity of interest. See *Beach* v. *Regional School District Number 13*, supra, 42 Conn. App. 550–51. Here, the question is whether the defendant physician's alleged negligence and the defendant hospital's alleged negligence differ in that the liability of each is separate and distinct from the liability of the other.

The nurses' negligence on which the defendant hospital's negligence was allegedly founded consisted of their application of warm soaks to the plaintiff's hand and their failure to call for a physician's assistance immediately. The defendant physician's negligence on which the defendant hospital's negligence was founded consisted of his failure to attend to the plaintiff until eight hours after being notified of the problem. The plaintiff also alleged that the defendant hospital was negligent in that unnamed employees had failed to prevent necrosis and had promoted it, that there was a failure to treat timely, a lack of sufficiently trained or experienced staff and a failure to train its staff properly.

The separate count, involving only the defendant physician, alleged that he did not exercise the degree of skill or care ordinarily exercised by physicians because he did not attend to the child until approximately eight hours after being notified of her condition, and he did not obtain consultations with other physicians.

Any negligence of the defendant hospital's employees, the nurses, arising from their actions or their inactions occurred before the defendant physician arrived on the scene. The defendant physician, on the facts as alleged, was not involved in the nurses' negligence, and

the nurses were not involved in the defendant physician's negligence. Thus, a jury could find the defendant hospital liable for the acts of its staff and nurses, excluding the defendant physician, which finding would constitute a different basis for liability. Moreover, a hospital may face direct liability for failure to adopt rules or protocols or failure to train its staff or physician employees. The plaintiff could have brought the action against the defendant physician without naming the defendant hospital as an additional defendant.

Although the defendant physician is an employee of the defendant hospital, he and it have a potentially adverse relationship. The second count against the defendant physician asserts an independent liability, whereas the first count alleges the defendant hospital's liability for the acts of its employees, agents or servants, including the defendant physician. The defendant physician's interest in escaping liability on count two could be adverse to the defendant hospital's liability on count one since he might argue and present evidence that the negligence of other employees, and not his own, proximately caused the plaintiff's injuries. A jury could thus simultaneously find the defendant hospital liable because others or another of its employees were negligent, which negligence proximately caused the plaintiff's injuries, and the defendant physician not liable because nothing that he did or failed to do proximately caused the plaintiff's injuries. The court correctly discerned that the claims against the two defendants were distinct, that is, substantially dissimilar. It should also be noted that even if the court found a unity of interest, it could, in its own discretion, give each defendant four peremptory challenges. See *Walsh* v. *Stonington Water Pollution Control Authority*, supra, 250 Conn. 465–66. We hold that the trial court did not abuse its discretion in allowing the defendant physician and defendant hos-

pital each to have four peremptory challenges because they lacked a unity of interest.

## II

The plaintiff next claims that the court improperly directed a verdict in favor of the defendant physician on the ground that the testimony of the plaintiff's expert failed to establish that the defendant physician's negligence proximately caused the plaintiff's injuries. We disagree.

We begin with a brief discussion of the well settled principles applicable to directed verdicts and proximate cause. "A court should direct a verdict if, on the evidence, the jury reasonably and legally could not have reached any other conclusion. . . . A directed verdict is justified if the plaintiff fails to present any evidence as to a necessary element of his or her cause of action." (Citation omitted.) *Poulin* v. *Yasner*, 64 Conn. App. 730, 734–35, 781 A.2d 422, cert. denied, 258 Conn. 911, 782 A.2d 1245 (2001).

The plaintiff and the defendant physician disagree as to whether the plaintiff's expert, Ronald Poland, a physician with a background in pediatrics and neonatology, established that the defendant physician had breached the standard of care owed to the plaintiff and whether Poland established that such breach proximately caused the plaintiff's injuries. The court allowed Poland to testify, agreeing that he qualified as an expert. The court found that Poland did not testify that the defendant physician had violated the standard of care owed to the plaintiff or that either of the alleged acts of negligence, failure to attend to the plaintiff in a timely manner or failure to consult with others, was causally connected to the decreased chance for successful treatment or to the loss of the plaintiff's fingers.

The court stated during the hearing on the defendant physician's motion for a directed verdict[8] that the plaintiff did not elicit Poland's opinion as to whether the defendant physician had violated the standard of care[9] or an opinion as to whether a causal connection between the lost chance claim and the injury existed.[10] The court concluded that unequivocal expert medical testimony was required as to both the alleged breach of the standard of care and the causal connection between that alleged breach and the injury because the level of sophistication needed to understand that connection was beyond the ordinary knowledge of a jury.

"All medical malpractice claims, whether involving acts or inactions of a defendant physician, require that a defendant physician's conduct proximately cause the plaintiff's injuries. The question is whether the conduct

---

[8] The same hearing also involved the defendant hospital's motion for a directed verdict, which the court denied on the ground that Poland had testified that the defendant hospital's employees had breached a standard of care because they had applied warm soaks and failed to call a physician, and that those breaches were a substantial factor in the plaintiff's injuries.

[9] The question and answer of Poland relating to the proper standard of care was as follows:

"Q. Now, do you have an opinion as to whether or not the [defendant physician] violated the proper standard of care in this instance?

"A. He—he had less of a chance to make a difference, because he wasn't involved until eight in the morning, which is now four hours after the event. And I said there was a six to eight hour window, which was probably shortened by the heat. And it wasn't clear that he saw it as an emergency or was told that it was an emergency, even at eight o'clock, because things got around to some sort of treatment around nine."

[10] At the hearing on the motion for directed verdict, the court reviewed Poland's testimony and recapped that testimony as follows: "Doctor, based on reasonable medical probability, would a consult with other physicians have had a reasonably, medically, probably likelihood of being successful outside of that four to six or the six to eight hour window?

"The answer is, 'No.'"

The court noted that although the expert stated that a consult within the time frame would have had no effect on the plaintiff's injury, he did not state that a consult within the time frame would have been successful in treating the plaintiff.

of the defendant was a substantial factor in causing the plaintiff's injury. Expert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." (Internal quotation marks omitted.) Id., 738.

The medical malpractice claim in this case is a "lost chance" or "loss of chance" claim because the complaint alleges a failure to treat promptly or to obtain consultations from other physicians, thereby "los[ing] or minimiz[ing] the chances for successful treatment." In such cases, a plaintiff proves his or her entitlement to recovery if he or she provides evidence to allow a jury to conclude that, more probably than not, the defendant was negligent and that negligence proximately caused the plaintiff's injury.

In this case, no exceptions exist to excuse the plaintiff from producing expert medical testimony to prove her case. The alleged negligence was not gross, the medical condition was not obvious, and the injury and the defendant physician's connection with the injury was not obvious enough to allow a lay juror to form a reasonable belief as to the negligence of the defendant physician. See *Shegog* v. *Zabrecky*, 36 Conn. App. 737, 746–47, 654 A.2d 771, cert. denied, 232 Conn. 922, 656 A.2d 670 (1995).

Poland had a residency in pediatrics and a fellowship in neonatal-perinatal medicine. Neonatology is the branch of medicine dealing with disorders of newborn infants, and perinatal medicine refers to medicine around the time of birth. Although the court properly accepted Poland as an expert witness, a thorough review of the transcript does not reveal that he clearly testified that the defendant physician had breached a standard of care owed to the plaintiff or that any action

or inaction by him caused the plaintiff's injury. We, therefore, affirm the judgment for the defendant physician that followed the directed verdict in his favor.

## III

The plaintiff next claims that the court should have granted her motion to set aside the jury verdict for the defendant hospital primarily because the court improperly allowed three physicians to testify as expert witnesses for the defendant. The plaintiff challenges the qualifications of John Grossman, a specialist in pediatric surgery, Steven Ruby, a professor of surgery at the University of Connecticut School of Medicine with subspecialty training in vascular surgery, and William Hellenbrand, a professor of pediatrics at Yale University School of Medicine who is board certified in both pediatrics and pediatric cardiology. The three experts testified as to the standard of care the hospital staff should have given the plaintiff with regard to the warm soaks and the failure to call a physician in a timely fashion. The plaintiff claims that the defendant hospital's experts were not neonatologists and therefore lacked the statutorily mandated qualifications to testify as experts. The plaintiff also claims that the experts lacked sufficient training, expertise and knowledge from the practice or teaching in a related field of medicine to testify as to the standard of care in the field of neonate pediatrics.

The standard of review of the denial of a motion to set aside a verdict is whether the trial court clearly abused its discretion. *Honan* v. *Dimyan*, 52 Conn. App. 123, 129, 726 A.2d 613, cert. denied, 249 Conn. 909, 733 A.2d 227 (1999). Appellate courts are disinclined to disturb jury verdicts because the trial court, from its vantage, is better able to assess the entire trial and because we review the evidence in the light most favorable to sustaining that verdict. *Gaudio* v. *Griffin Health*

*Services Corp.*, 249 Conn. 523, 534, 733 A.2d 197 (1999). We conclude that, given those standards, the court properly refused to set aside the verdict for the defendant hospital.

The defendant hospital's experts who were challenged were two surgeons, Grossman and Ruby, and a pediatric cardiologist, Hellenbrand. Poland, the plaintiff's expert, had testified that the hospital employees had breached the standard of care owed to the plaintiff in applying warm soaks and failing to call a physician immediately upon noticing the plaintiff's condition. Poland further testified that pediatric cardiologists are specialists with considerable expertise in the management of catheter complications and that he would defer to a surgeon with regard to appropriate surgical treatment for an ischemic injury[11] in a premature neonate. He also stated that in terms of medical treatment for the same type of injury, he would consult a surgeon.

Grossman was a surgeon with a specialty in pediatric surgery, with an emphasis on surgery of the hand, upper extremity and peripheral nerves. He had operated on neonates for problems related to vascular occlusion.

Ruby, the second challenged expert, is board certified in general surgery with subspecialty training and certification in vascular surgery. He testified that he had had substantial experience in treating vascular occlusions, that vascular surgery for a child and an adult involves the same principles and that he knew of no vascular surgeon in Connecticut who specialized in peripheral vascular surgery for neonates. The defendant hospital only offered Ruby's testimony with regard to treatment options available when the ischemic complication was first noticed.

---

[11] An ischemic injury refers to an injury to an organ or tissue resulting from insufficient blood supply to the part, which may be attributable to an obstruction or constriction of the blood vessels.

The plaintiff also argues that the defendant hospital's third expert, Hellenbrand, was not qualified because he was not board certified in neonatology. Hellenbrand was a pediatric cardiologist, a specialty Poland agreed would have expertise in the management of catheters. Hellenbrand treated newborns frequently in the setting of neonatal intensive care units and had experience in the management of catheter complications.

General Statutes § 52-184c (d) provides: "Any health care provider may testify as an expert in any action if he: (1) Is a 'similar health care provider' pursuant to subsection (b) or (c) of this section; or (2) is not a similar health care provider pursuant to subsection (b) or (c) of this section but, to the satisfaction of the court, possesses sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. Such training, experience or knowledge shall be as a result of the active involvement in the practice or teaching of medicine within the five-year period before the incident giving rise to the claim."

We agree with the trial court that the defendant hospital's experts were qualified to testify. Section 52-184c allows a health care provider trained and experienced in a medical specialty similar to that specialty in question to testify as an expert. The defendant hospital's experts had such a specialty. Furthermore, §§ 7-2[12] and 7-4 (a)[13] of the Connecticut Code of Evidence also pro-

---

[12] Connecticut Code of Evidence § 7-2 provides: "A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue."

[13] Connecticut Code of Evidence § 7-4 (a) provides: "An expert may testify in the form of an opinion and give reasons therefor, provided sufficient facts are shown as the foundation for the expert's opinion."

vide a basis for the court's acceptance of the testimony of the defendant hospital's experts.

There are many Connecticut cases that adhere to the liberalization of evidentiary rules allowing expert medical testimony in a medical malpractice action when there is a similarity of practice. See, e.g., *Pool* v. *Bell*, 209 Conn. 536, 542–43, 551 A.2d 1254 (1989); *Katsetos* v. *Nolan*, 170 Conn. 637, 646–47, 368 A.2d 172 (1976); *Fitzmaurice* v. *Flynn*, 167 Conn. 609, 618, 356 A.2d 887 (1975); *Marshall* v. *Yale Podiatry Group*, 5 Conn. App. 5, 7–12, 496 A.2d 529 (1985). Medical specialties overlap, and it is within a court's discretion to consider that fact in exercising its discretion to deem the witness qualified to testify. It is not the artificial classification of a witness by title that governs the admissibility of the testimony, but the scope of the witness's knowledge of the particular condition.

On the basis of our review of the expert testimony offered by the defendant hospital's three experts, we conclude that the court acted properly and did not abuse its discretion in not disturbing the jury verdict in favor of the defendant hospital. The evidence was sufficient for such a verdict.

The judgment is affirmed.

In this opinion the other judges concurred.