[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTIONS TO EXCLUDE EXPERT TESTIMONY
The defendants, The Ensign-Bickford Company, SCB Technologies, Inc., and Ensign-Bickford Industries, Inc.,[1] have moved to exclude the expert testimony of plaintiffs' proffered experts, G. John Foggiato ("Foggiato"), William C. Davis, Ph.D. ("Davis"), Alan A. Schachter ("Schachter"), and William E. Murray, Jr. ("Murray").
Facts
The plaintiffs, KV Scientific Company, Inc. ("KV"), and Alan and Rosalie Kammerman bring this suit based on the alleged appropriation of trade secrets by the defendants. KV is a two-person corporation located in Los Alamos, New Mexico, owned by Alan Kammerman and his wife Rosalie. Kammerman is an engineer and scientist who worked with Ensign-Bickford and SCBT during 1996 and 1997 on the application of semiconductor bridge ("SCB") technology to automobile airbag ignition, a process designed to make the discharge of airbags safer and more reliable. Semiconductor bridge technology was developed at Sandia National Laboratories for defense purposes. SCB Technologies ("SCBT"), now holds patents for that technology. SCBT was acquired in 1995 by Ensign-Bickford Company.
Discussion of the Law
The Connecticut Code of Evidence, Section 7-2, governs the admissibility of expert testimony:
A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue. CT Page 14285
Marshall v. Hartford Hosp., 65 Conn. App. 738, 757 n. 12, 783 A.2d 1085
(2001). The party seeking to introduce expert testimony bears the burden of establishing the admissibility of that testimony. State v. Porter,241 Conn. 57, 87, 698 A.2d 739 (1997) ("once the party opposing the evidence objects, the proponent bears the burden of demonstrating its admissibility").
Expert testimony is generally admissible if "(1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." Doe v. Thames Valley Council for Community Action, Inc.,69 Conn. App. 850, 872, 797 A.2d 1146 (2002), citing State v. Pjura,68 Conn. App. 119, 124, 789 A.2d 1124 (2002).
In State v. Porter, 241 Conn. 57, 66-68, 698 A.2d 739 (1997), cert.denied, 523 U.S. 1058, 118 S.Ct. 1384, 140 L.Ed.2d 645 (1998), the Connecticut Supreme Court adopted the standard for admissibility of scientific evidence as set forth by the United States Supreme Court inDaubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 5 87-89,113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Daubert mandates that before proffered scientific evidence may be admitted, the trial judge, has a responsibility to determine whether the proffered evidence will "assist the trier of fact." Daubert, 509 U.S. at 589.
A trial judge, therefore, serves a "gatekeeper function." Porter,241 Conn. at 69. Trial judges are not required to make a determination of the ultimate scientific validity of any scientific propositions. Instead, they "need only make a much more limited inquiry: whether sufficient indicia of legitimacy exist to support the conclusion that evidence derived from the principle may be profitably considered by a fact finder at trial." Porter, 241 Conn. at 91.
Not all expert testimony falls within the rubric of Daubert andPorter. As the Connecticut Appellate Court recently observed, "nothing inDaubert or Porter mandates that the trial court hold a Daubert hearing before ruling on the admissibility of expert testimony." Doe v. ThamesValley Council for Community Action, Inc., 69 Conn. App. 850, 872,797 A.2d 1146 (2002), citing Colon v. BIC USA, Inc., 199 F. Sup.2d 53,71 (D.Conn. 2001). In determining the admissibility of scientific evidence, the court must therefore first decide whether a Porter analysis is even appropriate. Hayes v. Decker, 66 Conn. App. 293, 304, 784 A.2d 417
(2001). CT Page 14286
"No opinion, lay or expert, can be based on conjecture or surmise. To avoid speculation, opinions and conclusions must be `reasonably probable' and not merely `possible.'" Tait's Handbook of Connecticut Evidence, § 7.5.5 (3d ed. 2001)).
While "[e]xperts are expected to make inferences and state opinions and they are granted wide latitude in determining what data is needed to reach a conclusion . . ., expert testimony that ignores existing data and is based on speculation is inadmissible." JMJ Enterprises, Inc. v. ViaVeneto Italian Ice, Inc., 1998 WL 17588, *6 (E.D.Pa. April 15, 1998) (interpreting Federal Rule of Evidence 702, which Connecticut Code of Evidence Section 7-2 is modeled after). Accordingly,
 when a trial judge analyzes whether an expert's data is of a type reasonably relied on by experts in the field, he or she should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert.
Id. (citing In re Paoli Railroad Yard PCB Litig., 916 F.2d 829, 857 (3d. Cir. 1990)). The United States Supreme Court has concluded that the trial court should preclude the expert from offering his or her opinion where too great of an "analytical gap" exists "between the data and the opinion proffered." General Electric Co. v. Joiner, 522 U.S. 136, 146
(1997) ("nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert").
Although the defendants have invoked Porter and Daubert, this court does not find that the evidence at issue warrants a Daubert analysis. The scientific/technical work of KV is at the heart of the plaintiffs' claims. However, the acceptance of a scientific, or technical principal is not directly at issue here. Instead, the defendants are really challenging the qualifications of the experts, as well as the foundation and the nature of the opinions offered. In light of the interdependence of the opinions of the experts, Foggiato, Murray and Schachter, passing on the issues raised by the defendants during the trial would cause significant delay. Therefore, even though the issues here do not warrant a strict Daubert analysis, they do warrant, and have received, a pretrial hearing.
Even without reference to Daubert, or Porter, Connecticut law requires the court to exclude evidence which is speculative. In Heath v.Commissioner of Transportation, 175 Conn. 384, 391-92, 398 A.2d 1192
(1978), the Court upheld the trial court's determination that a sketch produced by an expert purporting to show the cost of developing a parcel CT Page 14287 of land was too speculative to warrant admission, because the evidence focused on one particular use of the land, when various generalized industrial uses were possible. See also Graybill v. Plant, 138 Conn. 397,404, 85 A.2d 238 (1951) (exclusion of testimony of witness' "impression" concerning salary paid to decedent's secretary, when witness also testified that he did not remember). Expert opinion is not admissible unless it is stated in terms of the probable and not merely the possible. State v. Weinberg, 215 Conn. 231, 245, 575 A.2d 1003 (1990), citing Healy v. White, 173 Conn. 438, 443, 378 A.2d 540 (1977). "An expert opinion cannot be based on conjecture or surmise but must be reasonably probable . . . Any expert opinion that describes a condition as possible or merely fifty-fifty is based on pure speculation." Aspiazuv. Orgera, 205 Conn. 623, 632, 535 A.2d 338 (1987). It has long been recognized that, in order to avoid speculation and conjecture, a trier is not concerned with possibilities but with reasonable probabilities.Vickers v. Jessup, 32 Conn. App. 360, 363, 629 A.2d 457, cert. granted,227 Conn. 922, 632 A.2d 701 (1993), citing Boland v. Vanderbilt,140 Conn. 520, 525, 102 A.2d 362 (1953). Thus, to avoid speculation, opinions and conclusions "must be reasonably probable and not merely possible." C. Tait J. LaPlante, Connecticut Evidence (2d Ed. 1988) 7.16.4, p. 176.
G. John Foggiato
In their expert disclosures, the plaintiffs state that Foggiato, an engineer with Exponent, Incorporated, will provide an opinion that Alan Kammerman and KV Scientific (collectively, "KV") added value to Ensign Bickford and SCBT because they were "technically credible to various automotive manufacturers such as Volvo and BMW." Furthermore, Foggiato will offer an opinion that "the relationship between the Plaintiff and the Defendants and their large expenditures of time and resources in advancing the development of the SCB igniter led to a growing property value as they progressed toward commercialization." Thus, Foggiato's expert testimony would focus on the automotive industry, specifically the use of the SCB technology in automotive airbag ignition systems.
Foggiatio, however, has admitted that he has no experience with the automotive industry and has no credible experience with airbag ignition systems and SCB technology. When asked about his experience with airbag ignition systems at his deposition, Foggiato replied that he has had "[v]ery minimal experience in the sense that in the past week I've basically been at the Phoenix facility of Exponent and proceeded to take a look at airbags and fire off some airbags." He testified that he talked to some personnel at the Phoenix facility only "about essentially what CT Page 14288 the airbag industry is all about so that we could come up with something on the learning curve. That's all we did."
As to the SCB, which is at the heart of this case and his testimony, Foggiato had never worked with the SCB before he was hired to give an opinion in this case. Although he has had some experience in the general field of semiconductors, Foggiato never tested any SCBs on his own and has only reviewed some testing allegedly performed by the plaintiff. Furthermore, Foggiatio has never tested ignition devices before and testified that "the only thing" he knows about the testing of ignition devices is the name of a particular type of test used and the minimum sample size to be used in such a test.
Foggiato's opinions offered at his deposition have little or no factual basis. Given that he admitted that he has no experience in the automotive industry, his opinion that Alan Kammerman and KV "were technically credible to various automotive manufacturers such as Volvo and BMW," must be based on some fact. Foggiato admitted that he had never spoken with anyone employed by Volvo or BMW or anyone else in the automotive industry to determine whether they found KV to be "technically credible." It appears that the only basis for this opinion comes from Alan Kammerman himself.
Foggiato also opines that KV "added value" to the SCB airbag technology because it engaged in the first two stages of the process of commercializing technology: the conceptual stage and the exploratory stage.[2] The following is a sample of the testimony of Foggiato at his deposition:
 In the exploratory stage he [Kammerman] did a number of things, One, he began by looking at what are the requirements for essentially a new airbag system, and call them smart airbag systems, or versions thereof, hybrids, proceeded on to take and say, hey, what is needed in that arena is a number of smart sensors, and also a number of possible devices that would allow the airbag to be controlled in terms of actual explosions or blowing up, expending, as we call it. So that's what he started to work on.
 And then from there there might be some technology that's more viable or more useful than the current hot wire technology that was being used, therefore he says, the SCB happens to be a device that maybe could fulfill that particular niche.
So from there he took and went ahead to start to explore the viability of using that, and did considerable, well, did a number of things in CT Page 14289 terms of literature searches also look at, you know, who might be the companies that might be most interested in that particular area, and in this case Volvo being sort of the premier safety conscious company of the world from an automobile point of view decided to review th Volvo materials, manuals in this case, and from that was able to say, hey, this might be a very viable technique to address essentially the requirements for this smart feature airbag system.
 So that's what he did in terms of taking and launching it. And from there he started to work with back and forth Volvo, so some extent, and then with the other companies, in order to determine essentially what are the requirements in terms of specification for essentially this device to be incorporated as part of the airbag system, and frankly displace the hot wire, so that was sort of his exploratory work.
Deposition of G. John Foggiato, pp. 37-39.
Foggiato testified that Kammerman worked with Volvo and other car companies to determine the specifications required to incorporate the airbag technology into their automobiles. However, Foggiato had no idea what those specifications were, and, more importantly, did not know whether the SCB airbag technology o which KV worked ever reached those specifications.
Foggiato further testified that KV and Kammerman made a technical contribution by determining that the SCB might be a viable technology to address the requirements for "smart" automobile airbag igniters. He admitted, however, that he never investigated what research or development any of the defendants had made with the SCB concerning the automobile airbag igniters before investigating market opportunities with KV. Foggiato ultimately conceded that other entities came up with this idea before KV and that at least one other company worked on interfacing the technology.
Foggiato added "I think that Alan Kammerman provided additional data to verify that the SCBs could be applied in the automotive market." He then conceded, however, that he failed to investigate whether any other entity, be it the defendants or otherwise, came up with this purported additional data before KV. Consequently, the opinion that KV and Kammerman made a technical contribution by determining that the SCB might be a viable technology to address the requirements for "smart" automobile airbag igniters has no factual basis whatsoever.
Foggiato also testified that KV contributed value in that it determined the physical parameters to convert the electric system used CT Page 14290 from constant current to constant voltage. Foggiato admitted, however, that he did not investigate whether KV came up with the conversion. He ultimately conceded that "[t]here's a possibility" that Alan Kammerman could have "copied it from a manual somewhere else." Foggiato never investigated whether anyone else, such as the defendants, made a similar determination before KV purportedly did. Foggiato simply "presumed that it was [KV's] idea." Again, there is far too great an "analytical gap" between Foggiato's conclusion and the facts on which it is based to render this opinion reliable.
Finally, Foggiato testified that KV purportedly contributed value in that it developed a manufacturing line concept for the SCB igniter. The basis for this opinion was that Foggiato saw the concept discussed in an item of correspondence that was on KV's letterhead. Foggiato was asked whether he confirmed that KV came up with this concept or simply appropriated it from a third-party. He responded that it is "very reasonable" that KV got this idea from a third party.
The gravamen of Foggiato's opinion is that KV and Kammerman advanced the SCB airbag technology to a degree that would aid the defendants in ultimately making money from the manufacture and/or sale of SCB airbags. However, after hours of testimony, Foggiato was completely unable to describe precisely what Kammerman had done that constituted an advancement, whether what he had done was original to him, the level of the airbag technology known to the defendants before their association with Kammerman, or whether Kammerman's work brought the airbag technology any closer to being viable for use by Volvo or other automobile manufacturers.
Given Foggiato's admitted lack of knowledge and experience in the automotive industry and lack of knowledge and experience with the SCB airbag technology, the vagueness of his opinions was not surprising. One must thoroughly understand a technology and its development before he can opine as to whether a technological step constitutes an improvement to or adds value to the technology. Absent such thorough understanding, an expert with generalized knowledge of a particular field, such as semiconductors, may base his opinion on authoritative scientific or technical texts. Foggiato had neither any specialized knowledge, nor did he rely on any texts or other authoritative sources. As a result, "there is simply too great of an analytical gap between the data and the opinion proffered." Joiner, supra, 522 U.S. at 146.
It appears to the court that Foggiato's "opinions" are largely based on his lengthy conversations with Kammerman and will be offered in "a superfluous attempt to put the gloss of expertise, like a bit of CT Page 14291 frosting" on the expected testimony of Kammerman. See State v. Kemp, 199. Conn. 473, 478-79, 507 A.2d 1387 (1986). Such opinions are properly excluded as part of the court's gatekeeper function. See State v.Porter, supra, at 73. "Scientific or expert testimony particularly courts the substantial danger of undue prejudice or of confusing the issues or of misleading the jury because of its aura of special reliability and trustworthiness." United States v. Collins, 395 F. Sup. 629, 637
(M.D.Pa. 1975)
Based on the foregoing the Motion to Exclude the Testimony of G. John Foggiato is granted.
William E. Murray. Jr.
Like Foggiato, Murray is an employee of Exponent, Incorporated. According to the plaintiffs' expert disclosures, Murray and Foggiato will offer the opinion that KV was "technically credible to various automotive manufacturers such as Volvo and BMW." Furthermore, they will offer the opinion that "the relationship between the Plaintiff and the Defendants and their large expenditures of time and resources in advancing the development of the SCB igniter led to a growing property value as they progressed toward commercialization."
Murray and Foggiato divided the labor between themselves. Foggiato's task was limited to determine whether KV made any technological contribution concerning the commercialization of the SCB in the automotive airbag industry. Murray focused on whether that technical contribution translated into a marketing or commercialization value. As a result, Murray did not analyze whether KV made any technical contribution, and throughout his deposition he deferred to Foggiato on all such technical issues. Thus, the exclusion of Foggiato's testimony presents the first ground upon which Murray's testimony must be excluded.
Even if the court had not excluded Foggiato's testimony, Murray's testimony would not be admissible. The plaintiffs will offer Murray's opinion that Kammerman and KV's technical contributions provided a property value in that they made it more likely that the SCB would be successfully commercialized in the automotive airbag industry. This opinion is based on three conclusions that require such great and unjustifiable analytical leaps that they are not reliable.
First, Murray concludes that KV provided the defendants with the education necessary to participate in the automotive airbag market. According to Murray, the lone factual support for this is found in reports that Martin Foster, of defendant SCB Technologies, Inc., CT Page 14292 submitted to Sandia National Laboratory concerning attempts to commercialize the SCB technology. Murray avers that the 1997 report reflects a stronger interest on the defendants' part in the SCB's use in airbags and a better understanding of the technology associated with commercializing the SCB in the airbag industry than the 1996 report does. Relying on the fact that during this period Foster began to interact with Kammerman more frequently, Murray leaps to the conclusion that this change is the product of KV's efforts. At trial, the plaintiffs will be able to introduce the foregoing two reports into evidence, and argue that they support an inference of KV's contribution. However, such an inference is not a reasonable basis for Murray's "expert" opinion that KV increased value.
Murray failed to conduct any analysis to support the aforementioned leap. Most importantly, he has no idea what the extent of the defendants' knowledge and experience was in 1995 concerning the use of SCBs in airbags. Murray never investigated whether the defendants were aware of or working with any other entity concerning the use of SCBs in airbags at that time or beforehand. He is aware, on the other hand, that one company, Thiokol, was trying to market that technology for airbag use before 1995, although he has no idea what that company did or what the defendants learned about the SCBs and airbags from that effort. In fact, he has no idea what was occurring among the sublicenses of SCB technology in the automobile industry before 1995. He never talked to Foster or any of the defendants' employees to ascertain the extent of their understanding of the application of SCBs to automotive airbags or their efforts to increase that knowledge independently of working with KV. He simply speculates that SCBT's, EBCo's and Foster's knowledge came from KV.
The second conclusion on which Murray's opinion is based is similarly rooted in speculation. Murray contends that KV added value by generating a customer base. He reasons that there was a customer base as a result of KV because Volvo and BMW were "interested" in the opportunities KV presented. What makes this opinion unreliable is that Murray has no idea what these companies were interested in (e.g., the technology, working with defendants) or how interested they were. Worse yet, through this conclusion, Murray is essentially attempting to offer testimony about what was in the minds of these companies. This is not based on any discussions he had with any of these companies; he never talked to any of them. Murray states that the fact that these companies responded to KV's correspondence demonstrates that KV generated some "interest." But the mere fact of correspondence is not enough to evaluate any interest on the part of these companies, nor is it enough to conclude that these companies were interested as a result of KV. CT Page 14293 Murray's conclusion to the contrary is pure guesswork.
Furthermore, Murray's opinion of value by "interest" is vague, ambiguous and tremendously misleading. His opinion suggests that the "interest" generated by KV equates to monetary "value." Yet, it is undisputed that in the data he reviewed no one in the automotive industry was willing to or did pay any funds to KV as a result of its efforts. Murray's review, being limited to the period prior to August 1, 1997 can cite to no indirect or direct data supporting the meaning of "value" in his opinion, thus rendering the concept elusive of definition and misleading to the jury.
Finally, Murray concludes that KV's efforts had a property value because there is an internal memorandum from the defendants stating, without more, that they should consider negotiating with KV. Murray bases his conclusion on a theory of his own design that a person would not consider negotiating unless he is certain that the other person had something of value to provide. The memorandum, however, says nothing else about negotiation. It does not indicate — and thus Murray has no knowledge of — what the negotiation might concern, what the reason for that statement was, whether it was even a serious consideration, or whether it was rejected as worthless option. Standing alone, the statement provides no basis for Murray's conclusion. He simply speculates about what might have been in the minds of the defendants.
For the foregoing reasons, the Motion to Exclude the Testimony of William B. Murray, Jr. is granted.
Alan A. Schachter
The plaintiffs have offered the testimony of Alan A. Schachter on the issue of damages. Like the testimony of Murray, the testimony of Schachter depends on the admissibility of the testimony of Foggiato. Therefore, the inadmissibility of Foggiato's testimony is one ground on which the testimony of Schachter must be excluded. There are also independent grounds.
Schachter' calculations are made under three models:
 1.) Defendants commercialize the semiconductor bridge ["SCB"] technology in the worldwide automotive airbag market without forming a joint manufacture venture with a third party;
2.) Defendants commercialize the SCB technology in the worldwide automotive airbag market by forming a joint manufacture venture with such CT Page 14294 a third party manufacturer;
3.) Defendants commercialize the SCB technology solely with BMW.
In his lost profit calculations, Schachter makes three critical assumptions. First, he assumes that the technological innovation that is at dispute will become commercially viable for use in automobiles. Second he assumes that it will achieve worldwide acceptance and, hence, profitability. Third, in projecting royalties until the year 2020, he assumes that this technological innovation will have a shelf life of twenty years. The paucity of factual support for any of these assumptions is staggering.
Neither Foggiato nor Murray opined as to the commercial viability of the SCB airbag technology. Neverthless, Schachter posits not only commercial viability, but also worldwide acceptance. This opinion is based on Schachter's statement that once BMW adopts this technological innovation, there will be a "pull-through effect" in the worldwide automobile industry. Admitting that he is an accountant and has no specialized knowledge of the automotive industry, he supports this bold assumption by referring to the testimony of Foggiato and Murray. But neither Murray nor Foggiato testified as to the pull-through effect. Arguably the strongest basis for this assumption lies in two internal viewgraphs of the defendants which specifically address "pull" within the automobile industry. The existence of two viewgraphs, however, is not dispositive on the issue of whether the technological innovation would achieve worldwide acceptance and is insufficient as a matter of law to prove worldwide acceptance to a reasonable probability.
Perhaps most astonishing is Mr. Schachter's assumption that not only would the technological innovation achieve worldwide acceptance and profitability, but that this profitability would last twenty years. Schachter confesses that the sole basis for this assumption is that the technological innovation would mirror the life of the original technology: "I projected royalties out to 2020 because the original technology, the hot wire technology or hard wire technology in the airbags of current automobiles, came into existence in the early 1980's and has had a life in excess of twenty years." Yet Schachter made no inquiry into the historical performance of the current hot wire technology and admits that "it is possible that the SCB could be displaced during the next twenty years or earlier."
Schachter's time span projection suffers a similar defect as that of the expert witness in Beverly Hills Concepts v. Schatz Schatz,247 Conn. 48, 63, 717 A.2d 724 (1998), who projected lost profits over a CT Page 14295 time span of more than a decade. The Connecticut Supreme Court found this time span unreasonable:
 [T]he choice of a twelve year time span appears quite arbitrary . . . The time span applied in the present case was not tied to any objective facts that reasonably could be construed as supporting the plaintiffs claim that the sale of fitness center franchises would have become profitable and would have remained so for twelve years.
Beverly Hills Concepts, 247 Conn. at 77. This court likewise concludes that the twenty year projection by Mr. Schachter lacks the requisite tie to objective verifiable facts that bear a logical relationship to projected future profitability.
For the foregoing reasons the Motion to Exclude the Testimony of Mr. Schachter is granted.
William C. Davis
The defendants have moved to exclude the testimony of William C. Davis, Ph.D., on grounds similar to those advanced with respect to the other experts. The plaintiffs retained Davis to provide an opinion with regard to the technical contributions of KV toward the development of SCB technology for use in the automotive industry between the years 1995 and 1997. On February 1, 2002, the plaintiffs disclosed that they intend to call Dr. Davis as both a fact and expert witness at trial. Based on the testimony at his deposition Davis will opine at trial that KV determined — through experimental testing and the study of SCBs — that SCBs could be integrated into automotive airbag systems and that KV's technical contributions constituted "first-class engineering."
Unlike Foggiato, Murray, and Schachter, whose opinions were interdependent, the opinions of Davis do not rely on the opinions of other experts. Dr. Davis received a B.S. in Engineering from Tufts University in 1949 and a Ph.D. in Physics from Johns Hopkins University in 1954. He has worked as an engineer for close to fifty years, both as an employee of Los Alamos National Laboratories and as an engineering consultant at Energetic Dynamics. Dr. Davis has worked extensively with energetic materials and explosives, including detonation initiators. He has also published an extensive number of articles and books on explosives and energetics.
The defendants argue that Davis is not qualified to testify in this matter because he does not have any appreciable experience with SCBs. The CT Page 14296 Connecticut Code of Evidence, Section 7-2, governs the admissibility of expert testimony:
 A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue.
The court has reviewed the deposition testimony of Dr. Davis. His opinions are based largely on his review of the work of KV. Although Davis has no particular experience with SCBs, he is an explosives expert. The ability to produce the type of explosion necessary to activate an automobile airbag was an important facet of the commercialization of the SCB airbag technology. Dr. Davis' training and years of experience at Los Alamos Research Facility provide him with the qualifications to analyze the technical work of the plaintiffs. Our law does not require an expert to possess industry-specific experience.
 Generally, if a proponent of testimony establishes reasonable expert qualifications for a witness, further objections to that expert's testimony go to its weight, not its admissibility. C. Tait J. LaPlante, supra, § 7.16.7, p. 179. We are not persuaded to abandon this principle in favor of a bright line rule that expert witnesses must possess prior industry-specific experience. Industries may be segmented infinitesimally. Some economists' and accounting professionals' skills may be transferred between industries.
Beverly Hills Concepts v. Schatz Schatz, 247 Conn. 48, 63,717 A.2d 724 (1998).
Like the plaintiffs' other expert witnesses, Davis was prone to expressing opinions conveyed to him by Kammerman as his own opinions. For example, he testified concerning the financial arrangements between the defendants, KV and Kammerman, but had reviewed no documents concerning that subject. Therefore, his opinion must have come from Kammerman, and, of course, should not be allowed. However, in light of both his education and experience, this court concludes that Dr. Davis is qualified to provide his opinion as to the nature and quality of the plaintiffs' work. While certain aspects of Dr. Davis' opinions were subject to question, they were based on his knowledge and experience and are, therefore admissible. The flaws brought out by the defendants at his deposition go to the weight of his opinions rather than their admissibility. Therefore, the Motion to Exclude the testimony of Dr. CT Page 14297 Davis is denied.
By the court,
Aurigemma, J.