NICHOLE DOE ET AL. *v.* THAMES VALLEY COUNCIL
FOR COMMUNITY ACTION, INC., ET AL.
(AC 20596)
(AC 20597)

Foti, Flynn and Peters, Js.

Argued October 16, 2001—officially released May 21, 2002

*John B. Farley*, with whom, on the brief, were *George D. Royster, Erik J. Ness* and *Ralph W. Johnson III*, for the appellant (named defendant).

*Henry C. Ide*, for the appellant (defendant Scott Dixon).

*Gilbert Shasha*, for the appellees (plaintiffs).

*Opinion*

PETERS, J. This civil action concerns claims for damages for alleged sexual assaults of preschool girls by their school bus driver. At trial, none of the girls was available as a witness because none remembered any of the alleged assaults. The principal issue on appeal is the admissibility, under the residual exception to the rule against hearsay, of the testimony of third party interviewers who spoke with the girls at a time when the girls still had some recall about the alleged sexual assaults. The trial court concluded that, under the circumstances of this case, the contested testimony was admissible because it was both necessary and reliable. We agree and affirm the judgment of the trial court.

The plaintiffs, four minor children, N, J, L and A brought an action, by and with their parents, against the defendants, Thames Valley Council for Community Action, Inc. (employer), and Scott Dixon, in which they alleged that Dixon had sexually assaulted the children and that the employer had acted negligently in hiring and supervising Dixon. Both defendants denied the occurrence of the alleged sexual assaults, and the employer, in addition, denied any liability for negli-

gence. A jury found in favor of the plaintiffs against both defendants and assessed economic and noneconomic damages in the total amount of $526,600.[1] The court denied the defendants' motions for judgment notwithstanding the verdict, to set aside the verdict and for remittitur and rendered judgment against both defendants.

In their appeal from this judgment, the defendants have raised three issues. The defendants maintain that the court (1) abused its discretion by admitting into evidence hearsay statements about the alleged sexual assaults, (2) abused its discretion by admitting into evidence the expert testimony of a clinical psychologist and (3) improperly awarded damages for which there was no evidentiary basis. The defendant employer has not pursued any appellate claim challenging its liability for negligence.

I

RESIDUAL HEARSAY

The defendants' principal claim is that the court should not have permitted various interviewers of the girls to testify about the girls' statements of sexual abuse. The court decided that all of these statements were admissible under the residual exception to the hearsay rule, and one was also admissible under the medical treatment exception.[2]

"[T]he trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the

---

[1] The total award of economic damages for the parents was $111,600. The total award of economic damages for the minor children was $195,000. The total award of noneconomic damages for the minor children was $220,000.

[2] The court made its rulings abundantly clear. On the record, the court stated, after one of its rulings: "I'm happy to articulate."

court's discretion." (Citation omitted; internal quotation marks omitted.) *New England Savings Bank* v. *Bedford Realty Corp.*, 238 Conn. 745, 752, 680 A.2d 301 (1996). We are not persuaded that there was any such abuse of discretion.

Before addressing the defendants' specific claims of evidentiary impropriety, we set forth generally applicable legal principles. A basic rule is that "[a]n out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible unless an exception to the general rule applies." *State* v. *Hines*, 243 Conn. 796, 803, 709 A.2d 522 (1998). The residual exception is one of these exceptions, but it is one that should be used very rarely and only in exceptional circumstances. *United States* v. *Medico*, 557 F.2d 309, 315 (2d Cir.), cert. denied, 434 U.S. 986, 98 S. Ct. 614, 54 L. Ed. 2d 480 (1977). The residual exception has, however, been held to be "particularly well suited for the admission of statements by victims of child abuse and has been used in federal and state courts for this purpose. See, e.g., *United States* v. *Dorian*, 803 F.2d 1439 (8th Cir. 1986); *United States* v. *Nick*, 604 F.2d 1199 (9th Cir. 1979) . . . ." (Citation omitted.) *State* v. *Dollinger*, 20 Conn. App. 530, 540, 568 A.2d 1058, cert. denied, 215 Conn. 805, 574 A.2d 220 (1990). Finally, we note that, in this civil case, recourse to the residual exception does not implicate the confrontation clause contained in the United States constitution[3] or the Connecticut constitution.[4]

When applicable, the residual exception to the hearsay rule permits statements to be admitted into evidence under limited circumstances that resemble traditional exceptions to the general prohibition of hearsay statements. The proponent of the admissibility of

---

[3] See the sixth amendment to the United States constitution.

[4] See article first, § 8, of the Connecticut constitution.

such evidence must demonstrate that the proffered testimony is necessary and that the statements are supported by guarantees of reliability that are equivalent to evidence admitted under traditional hearsay exceptions. Conn. Code Evid. § 8-9; see also *State* v. *McClendon*, 248 Conn. 572, 583, 730 A.2d 1107 (1999); *State* v. *Lewis*, 245 Conn. 779, 805, 717 A.2d 1140 (1998); *State* v. *Hines*, supra, 243 Conn. 810; *State* v. *Oquendo*, 223 Conn. 635, 664, 613 A.2d 1300 (1992); *State* v. *Sharpe*, 195 Conn. 651, 665–66, 491 A.2d 345 (1985). *State* v. *Dollinger*, supra, 20 Conn. App. 541, lists various factors that may help a court to determine whether these guarantees of reliability are present.[5]

In this case, the parties agree that the necessity requirement has been met because of the lack of recall on the part of the girls of what happened between September and October of 1990. What is at issue is whether the plaintiffs have satisfied the second requirement that admissible hearsay statements must be supported by guarantees of reliability. That requirement is met "in a variety of situations, one of which is when the circumstances are such that a sincere and accurate statement would naturally be uttered, and no plan of falsification be formed. *State* v. *Sharpe*, supra, 195 Conn. 665. At minimum, the statement must independently bear adequate indicia of reliability to afford the trier of fact a satisfactory basis for evaluating [its] truth . . . . *State* v. *Williams*, 231 Conn. 235, 249, 645 A.2d

[5] These factors include, "the age of the child, the nature of the assault, the presence of physical evidence of that assault, the relationship of the child to the defendant, the spontaneity of the statement, the reliability of the statements themselves and the reliability of the testifying witness." *State* v. *Dollinger*, supra, 20 Conn. App. 541. The court adopted these factors in reliance on the case of *Bertrang* v. *State*, 50 Wis. 2d 702, 184 N.W.2d 867 (1971), which is also a criminal case. We note that the court in *Bertrang* adopted a similarly flexible approach to the application of these factors, listing them as factors to be considered in exercising the court's discretion, but noting that "[e]ach case must be viewed on its particular facts." Id., 708.

999 (1994); accord *State* v. *Lapointe*, 237 Conn. 694, 737, 678 A.2d 942, cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996)." (Internal quotation marks omitted.) *State* v. *Hines*, supra, 243 Conn. 810.

We must assess whether the trial court abused its discretion in permitting the jury to hear testimony about statements by very young girls, none older than four years at the time of the alleged assaults. To determine whether the statements bore "adequate indicia of reliability," we must take into account the manner in which the testifying interviewers elicited the girls' statements. See *Washington* v. *Schriver*, 255 F.3d 45, 57 (2d Cir. 2001) (relying on consensus within academic, professional and law enforcement communities that improper interviewing techniques "can create a significant risk that the interrogation itself will distort the child's recollection of events, thereby undermining the reliability of the statements"). Walter A. Borden, a psychiatrist who was called as an expert witness by the defendants, described procedures that are likely to diminish the reliability of such statements. Among the procedures to be avoided are: leading questions; questions that, intentionally or unintentionally, amount to coaching; questions that trigger a young child's eagerness to please; questions that communicate that the interviewer is anxious, angry or upset; or questions that direct a child's attention away from a topic on which the child has been speaking. Although it is appropriate for interviewers to engage a child in play therapy, an interviewer must not direct the manner in which the child plays or chooses the toys with which to play. The use of drawings done by adults and anatomically correct drawings, rather than allowing a child to draw his or her own drawings, is considered directive. Statements are particularly unreliable if they are elicited in a single interview or by an untrained interviewer. Borden did not determine whether one of the statements at issue was so

unreliable that it should be excluded, although he questioned the reliability of one of the witnesses, a police officer.[6]

Bearing in mind Borden's analysis of potential pitfalls in interviews of very young children, we now turn to a detailed examination of the reliability of each of the statements whose admissibility is at issue. We will discuss each interviewer separately.

## A

Christine Diebel-Hempsted had therapy sessions with N and J.[7] Although she is not a licensed counselor, Diebel-Hempsted has a master's degree in clinical psychology and had been employed at a sexual abuse treatment center. For three years, she worked in a program specifically designed to treat sexually abused preschoolers. Her training sensitized her to the interviewing techniques that are appropriate for preschoolers who might have been sexually abused. She guarded against the risk of coaching and avoided communicating her own feelings to the child. Her description of the nonthreatening ways in which she had conducted her interviews coincided entirely with the professional guidelines recommended by Borden. As a result, the reliability of the statements made by N and J is greatly strengthened.[8]

---

[6] Although Borden's testimony specifically expressed doubts only about the admissibility of certain statements elicited by Charles Fetters, a Groton police officer, Borden engaged in a wide reaching discussion of guidelines for interviewing young children alleged to have been sexually abused. We may, therefore, rely on his testimony to help us evaluate the reliability of all the statements that the defendants claim to have been inadmissible.

[7] There was no relationship between these interviews.

[8] The defendants question the reliability of the children's statements to Diebel-Hempsted because she had no involvement with any legal aspects of this case. We know no reason why such involvement is required of a testifying therapist. Indeed, involvement might be argued to have a deleterious effect on impartiality.

1

## N's Statements to Diebel-Hempsted

N was born in October, 1986. She began her therapy sessions with Diebel-Hempsted on October 2, 1990, when she was not quite four years old. These sessions continued until December, 1991.

N's aunt brought her to Diebel-Hempsted because of behavioral problems at home. N knew the defendant as Scott.[9] She had no problem identifying him because she had an established relationship with him as her bus driver. Before coming to live in Connecticut with her aunt and uncle, N had moved frequently in other states. She might have been exposed to sexual encounters in one of those states. Her behavioral problems allegedly included lying.

In her therapy sessions with Diebel-Hempsted, N repeatedly said that Scott had touched her "pee-pee" and made her touch his "pee-pee." She volunteered that Scott had hair on his "pee-pee." She indicated that Scott had caused her physical pain.

The trial court's admission of these statements as reliable was not an abuse of its discretion. The statements were sufficiently reliable for three reasons. First, the statements were made during nondirective interviews with Diebel-Hempsted. Second, N's detailed and unequivocal description of Dixon's genitalia was likely to have been accurate because young girls ordinarily would not have been aware that an adult male would have genital hair on or surrounding his sexual organ. Her description was worded in a manner that was age appropriate. There was no clear evidence that her description had been contaminated by any prior sexual encounter with another adult. Third, over a period of some fourteen months, N had been consistent in her

---

[9] Each of the girls referred to Dixon by his first name, Scott.

description of Dixon and his actions. Such consistency is unusual for such a young girl.

The defendants maintain, however, that the court abused its discretion. As a matter of law, they fault the failure of the trial court to consider the absence of corroborative physical evidence, the lack of evidence of spontaneity and the court's failure to take sufficient account of N's young age. These considerations were among the relevant factors set out in *Dollinger*.

Our first response to these claims is to clarify *Dollinger*. *Dollinger* was a criminal case in which a defendant was charged with sexual abuse even though the victim was unavailable to give testimony. As in this case, *Dollinger* considered the admissibility of third party statements under the residual exception. In upholding that defendant's conviction, we listed seven factors that may be relevant to the admissibility of hearsay statements describing sexual abuse.[10]

The *Dollinger* list was not, however, intended to determine the applicability of these factors in civil cases. We reject the defendants' efforts to require a court, in a civil case, to determine admissibility in accordance with any preordained formula. We particularly reject the defendants' suggestion that a balance sheet approach governs a court's exercise of its discretion. Admissibility in a civil case does not turn on how many *Dollinger* factors a plaintiff can establish.

This case illustrates our interpretation of *Dollinger*. We disagree with the defendants that, as a matter of law, the court was obligated to take further account of three *Dollinger* factors: the absence of physical corroboration of the alleged assault, the alleged lack of spontaneity of N's statements and the age of N. In a civil case, under the circumstances that this record shows, we are

---

[10] See footnote 5.

persuaded that the plaintiffs were not required to show corroborative physical evidence[11] of injury because the alleged assault was improper touching.[12] Similarly, a spontaneous utterance contemporaneous with a sexual assault is unlikely to have occurred in a case, like the present, in which the alleged assaults were not witnessed by anyone other than the victims and the alleged perpetrator. To the extent that spontaneity refers to how the girls came to make these statements to their interviewers, that issue was fully explored at trial. Finally, it cannot have escaped the notice of the trial court that the issue of admissibility was the reliability of statements made by a young child. We conclude that the trial court properly took into consideration all of the relevant *Dollinger* factors.

We now address the specific claims of impropriety put forward by the defendants.[13] The defendants claim that the trial court misapplied *Dollinger* when it held Diebel-Hempsted's testimony to be admissible. They point to evidence that N's lying was one basis for her

[11] Furthermore, in *Idaho* v. *Wright*, 497 U.S. 805, 822–23, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990), which also involved the admission of statements by child victims of sexual abuse, the United States Supreme Court held that evidence corroborating the truth of hearsay statements was not relevant to determining whether the statements themselves were reliable.

[12] While we note that the alleged abuse of one plaintiff, J, involved more than improper touching, we maintain our view that a lack of corroborative physical evidence is irrelevant to the reliability of her statements. See part I A of this opinion.

[13] We note at the outset that we reject the defendants' suggestion that N's statements might have been influenced by a parents' meeting held on October 22 or 24, 1990. At that meeting, instances of sexual abuse involving Dixon allegedly were discussed. The defendants hypothesize that the anxieties associated with that alleged meeting might have been transmitted to N and thus might have contaminated her statements.

While the court invited the defendants during voir dire to show that some such contamination might have occurred, the defendants neglected to do so. At the time of the parents' meeting, N was living with her aunt. Our review of the record shows that the defendants failed to establish that N's aunt was even present at that meeting.

referral to Diebel-Hempsted and suggest that her accusation was a fabrication. They opine that N might have been exposed to male sexual organs on earlier occasions. Confusion about those prior encounters might have played a role in N's allegations against Dixon. The lack of stability in N's early years might have put a considerable burden of stress on N and might have induced her to try to curry favor with her aunt and uncle.[14] Diebel-Hempsted unconsciously might have coached N.

The court permitted the defendants to introduce evidence into the record concerning each of these possible obstacles to the admissibility of N's statements. Diebel-Hempsted explained that she was aware of the risk of coaching and conducted herself so as to avoid this risk.[15] To assure the spontaneity of N's statements, she conducted the sessions in a non-threatening manner. She was thoroughly cross-examined, as were the plaintiffs' other witnesses.

Contrary to the defendants' arguments, we are persuaded that the defendants' objections go to the weight and not to the admissibility of N's statements to Diebel-Hempsted. The defendants have failed to establish that the trial court abused its discretion in allowing this evidence to be presented to the trier of fact.

## 2

### J's Statements to Diebel-Hempsted

J was born in February, 1986. She began her therapy sessions with Diebel-Hempsted on August 13, 1991,

[14] The defendants allude to a parents' meeting on October 22 or 24, 1990, at which issues of sexual abuse involving Dixon allegedly were discussed. They extrapolate that the anxieties associated with that meeting "might have been transmitted" to some of the children and thus might have contaminated their statements. We can find no factual confirmation in the record that any evidence of this alleged event was ever presented to the jury. The defendants cite only transcript page 489, which reports an exchange between the court and counsel on voir dire, outside the presence of the jury.

[15] We do not understand the basis for the defendants' statement that "she was not concerned with proper interviewing techniques . . . ."

when she was almost five years old. The alleged sexual assaults had, however, occurred between September and October, 1990, one year before the beginning of her therapy. The therapy sessions continued until at least March, 1992.

J was brought to therapy because of behavioral problems. She suffered from nightmares. She had been involved in an incident in which an eight year old had lain on top of her and had tried to touch her genitalia. At J's school, other children had been sexually molested.

J told Diebel-Hempsted that Scott had sexually assaulted her in her school's bathroom. Diebel-Hempstead testified that J said that he had "tickled her tummy" and he had "touched his pee-pee with her hand." J also told Diebel-Hempsted that he took her into the bathroom, took off her clothes, and "humped [her]." J said that it "hurt her really bad." She used anatomically correct dolls of an adult male and child female to illustrate that "humping" was sexual intercourse. Similar to N, J also testified about the physical appearance of Scott's genitalia, stating that "it was all hairy."

Diebel-Hempsted believed that J's statements were reliable for many of the same reasons that she found N's statements to be reliable. J's description of the alleged sexual attack included information that ordinarily would not be accessible to a young child. J was consistent in her description of what had occurred. In addition, J made and maintained excellent eye contact with Diebel-Hempsted.

The defendants argue that the *Dollinger* factors were not properly applied and that many of those factors weighed against admissibility. We have already discussed the application of *Dollinger* in a civil case. As previously stated, *Dollinger* provides a list of various factors that the court may consider, if relevant to the

particular case, in determining the admissibility of third party statements under the residual exception to the rule against hearsay. The list is neither determinative nor rigid. As in the case of N, we do not view the absence of physical evidence as relevant. The abuse was reported ten months after it occurred. While the allegations in the case of J involved more than touching, the lapse of time between the abuse and the report of abuse makes the lack of physical evidence less significant than if the report had been made immediately following the abuse. The irrelevancy of the lack of physical evidence is further supported by a medical report, dated September 27, 1991, of a physical examination conducted on J by Janet Buck, a physician. The report indicated that although the exam did not show physical injury, "this certainly does not preclude the described events [from] having happened."[16]

Many of the specific objections that the defendants voice with respect to J are similar to those they raised with respect to N. They question J's alleged prior ignorance of adult male sexual organs because she might have gleaned this information from her encounter with the eight year old. They challenge the source of J's knowledge about sexual intercourse, which she referred to as "humping." She might, they argue, have learned about that from television, from a movie or even from her parents. In addition, the defendants question the reliability of the statements due to the lapse of time between the alleged incident and J's statements.

We are satisfied that Diebel-Hempstead was aware of proper interviewing techniques so as not to ask leading or directive questions. J's statements to Diebel-Hempsted were made in language that was age appropriate and sufficiently spontaneous. As in the case of N, the court allowed the defendants to cross-examine

---

[16] See footnote 11.

Diebel-Hempsted about all of the factors that could have potentially detracted from the reliability of J's statements. Diebel-Hempsted was forthcoming in her responses as to what she did not know and whether she had made further inquiries with the child after certain statements.

We view these challenges presented by the defendants as affecting the weight and not the admissibility of J's statements to Diebel-Hempsted. We are, therefore, not persuaded that the trial court abused its discretion.

B

Statements made by J were also admitted through the testimony of Officer Charles Fetters. Although the court did not allow Fetters to testify about statements made by the other child plaintiffs,[17] the court indicated that J's ongoing counseling sessions with Diebel-Hempsted made J's statements to Fetters sufficiently reliable for admissibility. The defendants argue that the court improperly admitted these statements. We agree.

At the time of the reported abuse in 1990, Fetters was a police officer with the Groton police department. From 1990 to 1995, Fetters served as a youth officer and investigated reports of injury or abuse to minor children. His educational background includes an undergraduate degree in criminal law and a master's degree in forensic science. He testified that he received training in interviewing children through two undergraduate courses in psychology. While Fetters testified that he took certain precautions in cases involving children, such as wearing civilian clothes and establishing a rapport with the child, there was no evidence that he was trained to avoid leading questions and unintentional coaching during an interview.

---

[17] Fetters conducted interviews with each of the child plaintiffs in this case. The court ruled that Fetters' testimony about the children's statements during these interviews was inadmissible in every case except J.

In this case, Fetters was contacted by Diebel-Hempsted after J had made revealing statements about her abuse. Fetters conducted one interview with J at the Groton police department on October 2, 1991. Fetters normally did not take notes during an interview, but would instead complete a report following the interview. Fetters testified that he commenced the interview by asking J about a book she had brought with her and then about where she went to school. J brought up the defendant's name in response to the question about school. She said that she had gone to another school, but did not like it because Scott was there. Fetters asked her who Scott was and she responded that he was the bus driver and that he was mean. When Fetters asked J why he was mean, she responded, "he humped me and also [N]." Fetters asked her what humping meant and she responded that "it's when a man puts his pee-pee inside a girl's pee-pee and moves like this" as she made an up and down motion with her hand. When Fetters asked J if it had been only one time, she responded that he had done it a lot. Fetters did not follow up on how many times she meant by "a lot."

Fetters then used anatomically correct drawings in his possession to ask J to point to different body parts, which she did correctly. She drew circles around body parts on some of the pictures, some at Fetters' direction and some on her own. In response to a picture of adult male genitalia, Fetters testified that J said "Scott's looks like this" and that "Scott's pee-pee has hair just like this picture does."

J then repeated that she didn't like Scott because he did "bad things" to her. She told Fetters that Scott "had pulled down his own pants and had taken out his pee-pee" and that he "had humped [her]" in the bathroom at school. Fetters again asked her what humping meant and she described it the same way as before. J said that Scott had hurt her and made her cry.

The court allowed Fetters' testimony regarding J's statements, finding that it met both the necessity and the reliability prongs of the admissibility test. See *State* v. *McClendon,* supra, 248 Conn. 583. Specifically, the court noted that other nondirective interviewers had "removed most of the problematic issues that go with a single interview . . . ."

We disagree with the court that corroboration by other interviewers made statements elicited by Fetters sufficiently reliable to be admitted. Fetters was not trained in proper interviewing techniques, particularly not those to be employed with child abuse victims. The court refused to admit statements by the other three victims through Fetters, finding in each case that the reliability prong had not been met and, in one case, expressly recognizing the directive nature of Fetters' questions. We are not persuaded that Fetters' questions to J were not also directive. He conducted only one interview with J which, according to the expert testimony of Borden, was not sufficient to establish a rapport and to explore in proper fashion the complex and sensitive issues arising out of child abuse. Rather than allowing J to draw her own pictures, Fetters used anatomically correct drawings which, as Borden testified, are improperly suggestive. We are persuaded that the circumstances surrounding J's statements to Fetters did not sufficiently guarantee the reliability of those statements. Fetters' testimony was, therefore, not properly admissible.

It is well established that before a party is entitled to a new trial because of an improper evidentiary ruling, that party has the burden of establishing that the improper ruling was harmful. *George* v. *Ericson,* 250 Conn. 312, 327, 736 A.2d 889 (1999); *Swenson* v. *Sawoska,* 215 Conn. 148, 575 A.2d 206 (1990). When determining that issue in a civil case, the applicable standard is "whether the improper ruling would likely

affect the result." (Internal quotation marks omitted.) *Pagano* v. *Ippoliti*, 245 Conn. 640, 652, 716 A.2d 848 (1998). If the improperly admitted testimony "is merely cumulative of other evidence presented in the case, its admission does not constitute reversible error." *Swenson* v. *Sawoska*, supra, 155; *Fink* v. *Golenbock*, 238 Conn. 183, 211, 680 A.2d 1243 (1996).

We look to the record to determine whether Fetters' testimony regarding J's statements likely would have affected the jury's verdict or whether it was merely cumulative to that of Diebel-Hempsted. See *Swenson* v. *Sawoska*, supra, 215 Conn. 153. We already have determined that J's statements to Diebel-Hempsted were properly admissible. The record does not reveal any testimony by Fetters that is not duplicative of Diebel-Hempsted's testimony.[18] We are, therefore, satisfied that the court's improper admission of Fetters' testimony was harmless.

C

The defendants challenge the admission of statements made by L to social worker Leanne Lane. The court admitted these statements under both the medical treatment exception and the residual exception to the rule against hearsay. The plaintiffs concede that the medical treatment exception was not properly applied, but argue that its application was harmless error because L's statements were properly admitted under the residual exception. We agree.

We previously have held that statements made to social workers are not admissible under the medical treatment exception, unless the social worker is considered to be a participant in the process of medical diagnosis or treatment and the statements are directed to obtaining diagnosis or treatment. See *State* v. *Cruz*, 56

[18] See part I A of this opinion.

Conn. App. 763, 768–69, 746 A.2d 196 (2000), aff'd, 260 Conn. 1, 792 A.2d 823 (2002); *State* v. *Barile*, 54 Conn. App. 866, 871, 738 A.2d 709 (1999). We agree, therefore, with the plaintiffs and the defendants that the medical treatment exception was not applicable to statements made to Lane, who had no connection with any medical diagnosis or treatment.

The court also admitted L's statements to Lane under the residual exception. If the residual exception was properly applied to these statements, then the court's improper admission of them under the medical treatment exception was harmless. See *Swenson* v. *Sawoska*, supra, 215 Conn. 153. We therefore focus our attention on whether L's statements were properly admissible under the residual exception to the rule against hearsay.

As in the cases of N and J, our determination of whether the residual exception was applicable depends on whether the statements were supported by guarantees of reliability. See *State* v. *McClendon*, supra, 248 Conn. 583. The interviewer at issue, Lane, has a master's degree in social work. During her graduate studies, Lane attended courses and workshop trainings on how to interview children when there have been allegations of child abuse. After earning her degree, she attended numerous workshops and conferences on that issue and obtained a position as a clinical social worker at the New London Child and Family Agency where she worked primarily with children.

L was born in March, 1986. She was taken for counseling with Lane after allegations of sexual abuse by a neighborhood boy and by Dixon and in connection with family marital problems. Lane held regular therapy sessions with L from May, 1991, until at least February, 1992. During those sessions, Lane observed L in child directed play therapy with toys of L's choice. Lane testi-

fied that she was careful not to pose directive questions and not to react or overreact when L made statements. She also testified that, after several months of therapy, L herself brought up the subject of the conduct of her former bus driver, Dixon, and stated that he couldn't hurt her anymore. L used dolls of a man and a girl to demonstrate how "the man" had touched her in her genital area. Lane testified that L had told her that the bus driver had followed her into the bathroom at school. L also told Lane that "the man with black hair" had followed her into the bathroom, sat on her and touched her "gina."

The record reveals that, in light of the circumstances surrounding L's statements to Lane, the statements contained indicia of reliability that were sufficient to permit their admission into evidence. Lane was specially trained in interviewing child victims of sexual abuse. Her sessions with L were regularly scheduled and spanned the course of almost one year. The spontaneity of L's statements was adequately explored by the court prior to the admission of the statements. Finally, the language used by L in describing the abuse was age appropriate.

The defendants argue that the delay of almost one year between the alleged abuse and when L made her statements impaired the reliability of those statements. That delay, however, was brought out before the jury in cross-examination and goes to the weight, rather than the admissibility, of Lane's testimony.

We are persuaded that the court did not abuse its discretion in finding L's statements reliable and admitting them through Lane under the residual exception. The court's improper application of the medical treatment exception, therefore, constituted harmless error.

## D

The defendants also challenge the admission of statements by A to Sarah Wilhelm.[19] As in the other cases, the court permitted Wilhelm to testify about A's statements under the residual exception to the hearsay rule. The defendants assert that the court improperly found these statements to be reliable when the court found statements made to Fetters in an interview conducted with Wilhelm unreliable. We disagree.

At the time of the interviews with A, Wilhelm was a social worker with the department of children and families. She received general training as a treatment social worker and ongoing training, which included training in the areas of sexual abuse and abuse of children. When she transitioned to investigations, Wilhelm received specific training on child sexual abuse. Wilhelm testified that the avoidance of leading questions was a repeated theme in all of her trainings.

A was born in March, 1987. A's parents took her to meet with Wilhelm and Fetters when they suspected that A had been sexually abused in October, 1990. Wilhelm and Fetters together conducted the first interview with A on November 5 or 6, 1990. In that interview, A made statements about what the bus driver had done to her. The court did not permit those statements to be admitted through Fetters, however, because they were not sufficiently reliable.

Wilhelm met with A alone for a second time on November 8, 1990. The court found sufficient indicia of reliability in statements made to Wilhelm and permitted her to testify about the interviews on both days. Wilhelm testified that, in both interviews, A stated that her day care bus driver, Scott Dixon, had "put his finger in her 'gina,' " which had been identified on an anatomically

---

[19] Sarah Wilhelm's name at the time of the interviews was Sarah Savin.

correct drawing as a vagina, and had "hurt her." A also stated that he had "hit his peanut," which was identified using anatomically correct drawings as his penis, and "it bled." When asked the color of the blood, she pointed to Wilhelm's shirt, which was off-white in color.

The defendants argue that it was improper for the court to admit A's statements through Wilhelm when it had found A's statements to Fetters to be unreliable because both Fetters and Wilhelm were present in the first interview. The unreliability of the first interview did not show the unreliability of a second interview in which Fetters played no role. Furthermore, the descriptive language used by A was age appropriate and extended beyond terms for body parts. That age appropriate language lent credibility to her description of a physical occurrence about which a four year old typically would have no knowledge. We are persuaded that the trial court did not abuse its discretion in admitting A's statements through Wilhelm.

II

EXPERT TESTIMONY

The defendants next claim that the court improperly admitted expert testimony by David Mantell, a clinical psychologist. The defendants argue that the court failed to hold a proper hearing under *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), to determine the admissibility of Mantell's testimony as an expert witness and, even if a proper hearing was held, that his testimony was not based on proper scientific methodology. We disagree.

We first set forth our standard of review. It is well established that "the trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling

involves a clear misconception of the law, the trial court's decision will not be disturbed." (Internal quotation marks omitted.) *Hayes* v. *Decker*, 66 Conn. App. 293, 298, 784 A.2d 417 (2001), cert. granted on other grounds, 259 Conn. 928, 793 A.2d 253 (2002). Expert testimony is generally admissible if "(1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Pjura*, 68 Conn. App. 119, 124, 189 A.2d 1124 (2002); see also Conn. Code Evid. § 7-2.[20]

On July 16, 1999, the defendants filed a pretrial motion in limine to preclude Mantell's testimony and to voir dire Mantell. The defendants challenged the reliability of Mantell's testimony under *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).[21] The court denied the motion as to preclusion without prejudice.

---

[20] Section 7-2 of the Connecticut Code of Evidence provides: "A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue."

[21] The defendant argued that under *Daubert* and *Kumho Tire Co., Ltd.*, the court had an obligation to act as a gatekeeper to ensure that Mantell's testimony was not only relevant, but also reliable. In support of their motion, the defendants asserted that Mantell was not qualified to testify as an expert because, inter alia, he was not a medical doctor, he had not provided treatment or diagnosis to the children, and he had not interviewed the defendant.

In *State* v. *Porter*, supra, 241 Conn. 57, our Supreme Court adopted the approach to determine the admissibility of expert scientific testimony set out in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, supra, 509 U.S. 579, which interpreted rule 702 of the Federal Rules of Evidence. The *Daubert* standard was incorporated into § 7-2 of the Connecticut Code of Evidence. See *Poulin* v. *Yasner*, 64 Conn. App. 730, 740, 781 A.2d 422, cert. denied, 258 Conn. 911, 782 A.2d 1245 (2001).

During trial, the defendants renewed their objection to the admission of Mantell's testimony for various reasons.[22] The defendants also requested voir dire of Mantell prior to the admission of his testimony, which the court granted. During voir dire, the defendants asked Mantell about the materials that he had reviewed in preparation for his testimony. Without inquiring into the methodology employed by Mantell, the defendants challenged the scientific basis for Mantell's opinion about the occurrence of the alleged misconduct and about the existence of a causal relationship between the claimed injury and the alleged abuse. The former challenge to Mantell's testimony became irrelevant because, in his testimony in open court, Mantell did not purport to give an independent opinion of whether the children had been abused. The court reserved the challenge to causality to be resolved in open court until the time of trial, when the plaintiffs would have an opportunity on direct examination to establish the scientific basis for Mantell's testimony.

Thereafter, on direct examination, the plaintiffs elicited Mantell's qualifications as an expert witness and his description of the process by which he had reached his conclusions. Mantell has a doctorate in clinical psy-

In *Kumho Tire Co., Ltd.* v. *Carmichael*, supra, 526 U.S. 141, the United States Supreme Court extended the *Daubert* standard to apply to other expert testimony. The defendants argue that *Kumho Tire Co., Ltd.*, had the effect of extending *Porter* to evidence other than "scientific evidence" in our jurisdiction. Our courts, however, have neither adopted nor rejected the *Kumho Tire Co., Ltd.*, rule. See *State* v. *Vumback*, 68 Conn. App. 313, 328 n.8, 791 A.2d 569, cert. granted on other grounds, 259 Conn. 933, 793 A.2d 1086 (2002); see also Conn. Code Evid. § 7-2, commentary.

[22] The trial transcript states in relevant part: "[W]e are objecting to Dr. Mantell's testimony. We are objecting under the *Daubert* case under the [*Kumho Tire Co., Ltd.*] case, that it's not scientific, that it's unreliable, that there is no foundation, that it's based on hearsay, that he's not an expert on negligent hiring, which is what—another one of the things he testified to, that there is inadequate disclosure, and that it invades the province of the jury. Those are the basic points."

chology and is licensed in clinical psychology in the state of Connecticut. He testified that he had over twenty years of experience in the area of clinical psychology, and specifically in the area of child sexual abuse. Mantell further testified that, during that time, he had conducted over 1000 evaluations of children suspected of having been sexually abused.

With regard to his methodology, Mantell stated that, in attempting to determine the consequences of the alleged sexual abuse, he followed the appropriate scientific approach, which he described to the court in detail. He testified that the process involves gathering the documentary record leading up to the complaint of sexual abuse; interviewing the people involved in the complaint, including the child victims; conducting interviews with other people about the alleged events and about the prior behavior patterns of the alleged victims; and performing psychological tests on the alleged victims. Mantell testified that each of those steps was routine and standard to investigations of alleged sexual abuse. He further stated that the psychological tests that he administered were standard in the practice of psychology and were each based on a solid scientific foundation. The defendants offered no testimony to challenge Mantell's qualifications.

Mantell was called as an expert witness by the plaintiffs to give his opinion, with reasonable medical probability, regarding the impact on the child plaintiffs of the alleged sexual abuse *if* such abuse had occurred. Mantell also testified about common characteristics of children who have been subjected to sexual abuse. He did not offer his opinion as to whether the child plaintiffs actually had been sexually abused. Similarly, he did not testify as to the reliability of the children's statements.

The defendants assert that the court improperly failed to hold a *Porter* hearing to determine the validity of

the methodology underlying Mantell's testimony. The defendants further argue that the court improperly placed the burden on the defendants to demonstrate that Mantell's testimony was inadmissible. We disagree.

Our review of the record reveals that, during the trial, the defendants made no request for a separate hearing other than the voir dire that was held. The defendants have provided no support, and we have found none, for the proposition that a court is obligated, despite the absence of any express request, to hold a separate hearing outside the presence of the jury upon the defendants' objection to expert testimony under *Daubert*. *Porter* does not impose such an obligation on the trial court. The court's failure to hold a separate *Porter* hearing was, therefore, not improper. See, e.g., *Colon* v. *BIC USA, Inc.*, United States District Court, Docket No. CV3666, 2001 U.S. Dist. LEXIS 21037 (D. Conn. December 19, 2001) ("[n]othing in *Daubert*, or any other Supreme Court or Second Circuit case, mandates that the district court hold a *Daubert* hearing before ruling on the admissibility of expert testimony").

The defendants' assertion that they were improperly burdened with proving the inadmissibility of Mantell's testimony is similarly unpersuasive. The plaintiffs questioned Mantell extensively on direct examination about his qualifications and about the methodology underlying his conclusions. The defendants had the opportunity to question him during voir dire and on cross-examination. Notably, on voir dire, the defendants failed to question Mantell about the scientific basis for the methodology that he employed in formulating any of his opinions and, specifically, his opinion regarding the impact of sexual abuse. The defendants also could have called their own expert witness to counter the process and methodology employed by Mantell.

Alternatively, the defendants argue that, even if the court complied procedurally with *Porter*, the court

improperly admitted Mantell's testimony because it was not based on scientifically valid principles. The defendants assert that Mantell's reliance on statements made by the children to other interviewers, without ensuring the reliability of the techniques used in those interviews, invalidated his conclusions. We disagree.

According to *Porter*, the court has a "gatekeeper" role to assess the validity of scientific principles and methodologies underlying the conclusions of expert witnesses; *State* v. *Porter*, supra, 241 Conn. 81; and "should exclude scientific evidence . . . when . . . concerns render the technique, and the resulting evidence, incapable of assisting the fact finder in a sufficiently meaningful way." Id., 88.[23] As previously discussed, Mantell offered his opinion as to the probable consequences of the alleged abuse *if* such abuse had occurred, not as to whether the abuse actually had occurred. On direct examination, Mantell testified about the process by which he reached his conclusions and stated that the process was standard in the practice of psychology. The defendants presented no evidence to the contrary. We are, therefore, not persuaded that the trial court improperly assessed the validity of the methodology underlying Mantell's opinion.

We are satisfied that the plaintiffs established that Mantell had special knowledge directly applicable to the issue of probable consequences of the alleged abuse if it had occurred. Mantell's knowledge was not common to the average person and could be expected to be helpful to the jury in considering the extent of damages to the plaintiffs. We are not persuaded that the court was further obligated to hold a separate hearing, sua sponte, to consider the admissibility of expert testi-

---

[23] We need not consider the question of whether the *Porter* standard must be extended to nonscientific testimony here where the court's rulings were not inconsistent with the *Porter* standard. See footnote 21.

mony. Accordingly, the court did not abuse its discretion in admitting Mantell's testimony.

## III

## DAMAGES

The defendants claim that there was insufficient evidence to support the jury's award of future economic damages. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. After returning a verdict for the plaintiffs, the jury awarded a total of $111,600 in economic damages to the parents of the four children and $195,000 in economic damages to the children. The defendants filed motions for judgment notwithstanding the verdict, to set aside the verdict and for remittitur. The defendants challenge the court's denial of these motions.

On appeal, the defendants claim that the plaintiffs failed to present sufficient evidence to support the jury's award of economic damages. Specifically, the defendants point to the lack of evidence of economic damages incurred up to the time of the award. The defendants claim that, in the absence of such a showing, the jury's award of economic damages was speculative and unreasonable. We disagree.

"The trial court's refusal to set aside [a] verdict . . . is entitled to great weight and every reasonable presumption should be given in favor of its correctness. In reviewing the action of the trial court in denying [a motion] . . . to set aside [a] verdict, our primary concern is to determine whether the court abused its discretion and we decide only whether, on the evidence presented, the jury could fairly reach the verdict [it] did. The trial court's decision is significant because the trial judge has had the same opportunity as the jury to view the witnesses, to assess their credibility and to

determine the weight that should be given to their evidence. Moreover, the trial judge can gauge the tenor of the trial, as we, on the written record, cannot, and can detect those factors, if any, that could improperly have influenced the jury. . . . Our task is to determine whether the total damages awarded falls somewhere within the necessarily uncertain limits of fair and reasonable compensation in the particular case . . . ." (Internal quotation marks omitted.) *Childs* v. *Bainer*, 235 Conn. 107, 113, 663 A.2d 398 (1995).

In determining an appropriate amount to award for future medical expenses, "the jury's determination must be based upon an estimate of reasonable probabilities, not possibilities. . . . The obvious purpose of this requirement is to prevent the jury from awarding damages for future medical expenses based merely on speculation or conjecture." (Citation omitted; internal quotation marks omitted.) *Marchetti* v. *Ramirez*, 240 Conn. 49, 54, 688 A.2d 1325 (1997). It is not speculative or conjectural to award future medical expenses when there is "a degree of medical certainty that future medical expenses will be necessary." (Internal quotation marks omitted.) Id., 55.

The court found that, in light of the evidence presented, the jury's award was reasonable. In its memorandum of decision, the court accepted Mantell's testimony that "Dixon's sexual abuse, with reasonable medical probability, will have a profound, long-term psychological impact on the thinking and emotions of the children and on their approach and reactions to relationships." The court further noted that "[a]t certain critical life junctures, such as puberty and adolescence, the children will be at great risk for the development of an assortment of mental, emotional and relationship disorders." The court noted that Mantell opined that the children's injuries would be permanent and that the children, therefore, would need further treatment. The

court determined that the jury reasonably could have inferred from Mantell's testimony that, with reasonable medical probability, the parents would incur expenses for treatment throughout the children's adolescence and that the children would incur expenses for counseling during their adult lives.

The defendants assert specifically that it was improper for the court to uphold the jury's award in the absence of evidence that the parents had incurred medical expenses prior to trial. In support of their position, the defendants cite *Marchetti* v. *Ramirez*, supra, 240 Conn. 56, in which our Supreme Court stated that "[t]he cost and frequency of past medical treatment . . . may be used as a yardstick for future expenses if it can be inferred that the plaintiff will continue to seek the same form of treatment in the future." (Internal quotation marks omitted.)

We disagree with the defendants' interpretation of *Marchetti.* The court expressly stated that expenses for past medical treatment "*may* be used as a yardstick for future expenses . . . ." (Emphasis added; internal quotation marks omitted.) Id. The court further confined the relevance of past medical treatment to cases in which the plaintiff "will continue to seek the same form of treatment in the future." (Internal quotation marks omitted.) Id. We find no support, and the defendants have failed to cite any, for the proposition that a showing of past medical treatment is necessary for an award of future medical expenses. While such evidence might be relevant if it exists, the absence of such a showing does not categorically preclude an award of damages for future expenses where it has been shown that future injury is reasonably probable.

We are persuaded that the court did not abuse its discretion in denying the defendants' posttrial motions with respect to damages. The record at trial was suffi-

cient for the jury to find that, with reasonable medical probability, the child plaintiffs would incur medical expenses in the future.

The judgment is affirmed.

In this opinion the other judges concurred.